**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| E3 Innovation Incorporated, et al., | No. CV-21-01141-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| DCL Technologies Incorporated, et al., | |
| Defendants. | |

This case arises out of a business relationship between a pair of Arizona-based companies, E3 Innovation, Inc. and E3 Displays, LLC (collectively, "E3" or "Plaintiffs"), and three independent contractors who worked remotely for Plaintiffs while located in other states. The independent contractors, Michael Steward,[1] Andrew Blum,[2] and DCL Technologies Incorporated ("DCL") (collectively, "Defendants"), have now moved to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue. (Docs. 19, 20.) For the following reasons, the motions to dismiss are granted.

…

…

---

[1] Michael Steward's spouse, Bobbie Jo Steward, was named in the complaint (Doc. 1-3 ¶ 12), but E3 now "agree[s] to voluntarily dismiss Bobbi Jo Steward from this action without prejudice, but E3 reserves all rights to seek leave to amend and add her as a defendant if discovery reveals that she engaged in the same tortious acts as her husband, Steward." (Doc. 22 at 2.) Thus, the Court will dismiss Bobbi Jo Steward from this action.

[2] Blum's spouse, Holly Blum, is also named in the complaint "solely in her capacity as Blum's spouse" (Doc. 1-3 ¶ 10), but E3 has not stipulated to her dismissal. Accordingly, she joins in the motion to dismiss filed by Blum and DCL.

# BACKGROUND

I. Background Facts

Because Defendants dispute personal jurisdiction, the Court will analyze jurisdictional facts in more detail *infra*. This summary, which is based on the allegations in the complaint, is simply intended to provide an overview of the parties and claims.

E3, which is based in Phoenix, Arizona, "is a global design and manufacturing company . . . [that] has helped the world's most innovative companies define the future of their business display needs through custom display solutions. It is a full-service provider for all industrial display enhancement needs." (Doc. 1-3 ¶¶ 5-7.)

In February 2018, E3 acquired Touch Trends, Inc. ("TT") and a component of Display Logic USA, Inc. ("DLU") known as the "Flex Division." (*Id.* ¶ 15.) Blum, who is the founder of DCL, and Steward were previously independent contractors with DLU and/or TT and, "as part of the [acquisition] agreement . . . demanded that they remain [with the company]." (*Id.* ¶¶ 8, 15.) Accordingly, "Blum, DCL, and Steward became independent contractors with E3." (*Id.* ¶ 16.)

After becoming an E3 independent contractor in February 2018, Steward served as E3's Vice President of APAC Operations. (*Id.* ¶ 11.) Steward ended his relationship with E3 on August 31, 2018. (*Id.* ¶¶ 11, 20.) "As part of Steward's exit, on October 12, 2018, E3 and Steward entered into a contractual 'Independent Contractor Termination, Release of Claims and Non-Compete Agreement'" ("the Steward Agreement"). (*Id.* ¶ 21.)

After becoming an E3 independent contractor in February 2018, Blum served as E3 Displays, LLC's Vice President of Business Development. (*Id.* ¶ 9.) During this period, Blum also continued serving as the sole member of DCL. (*Id.* ¶ 8.) Blum and DCL ended their relationship with E3 on December 4, 2020. (*Id.* ¶¶ 9, 18.) "As part of Blum's exit, on December 25, 2020, [E3,] Blum and DCL . . . entered into a contractual 'Acknowledgment of Termination of Services and Release'" ("the Blum Acknowledgment"). (*Id.* ¶ 19.)

E3 alleges that, after Steward and Blum departed, it discovered they had engaged in

a series of acts that breached the Steward Agreement and the Blum Acknowledgment and/or were tortious. (*Id.* ¶¶ 27-109.) In short, Defendants are accused of "pillaging [E3's] customers and suppliers and using E3 confidential information—such as quotes, designs, and other proprietary information—to gain unfair competitive advantage and leverage." (*Id.* ¶ 51.)

II.   Procedural Background

On April 28, 2021, Plaintiffs filed a complaint in Maricopa County Superior Court. (Doc. 1-3.)

On June 30, 2021, Blum and DCL removed the action to this court. (Doc. 1.)

On July 20, 2021, Blum and DCL (Doc. 19) and Steward (Doc. 20) filed separate motions to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue.[3]

On August 19, 2021, Plaintiffs filed responses to the motions to dismiss. (Docs. 21, 22.)

On September 3, 2021, Blum and DCL (Doc. 23) and Steward (Doc. 24) filed replies in support of the motions to dismiss.

**DISCUSSION**

I.   Legal Standard

A defendant may move to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (citation omitted). "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Id.* (citations and internal quotation marks omitted).

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017). "Arizona law permits the exercise of personal jurisdiction to the extent permitted

---

[3] Blum and DCL's request for oral argument is denied because the issues are fully briefed and argument would not aid the decisional process. *See* LRCiv 7.2(f).

under the United States Constitution." *Id.* (citing Ariz. R. Civ. P. 4.2(a)). Accordingly, whether this Court has "personal jurisdiction over Defendants is subject to the terms of the Due Process Clause of the Fourteenth Amendment." *Id.*

"Constitutional due process requires that defendants have certain minimum contacts with a forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quotation marks omitted). Minimum contacts exist "if the defendant has continuous and systematic general business contacts with a forum state (general jurisdiction), or if the defendant has sufficient contacts arising from or related to specific transactions or activities in the forum state (specific jurisdiction)." *Id.* at 1142 (internal quotation marks omitted).

Plaintiffs do not contend that Defendants are subject to general jurisdiction in Arizona. (Doc. 21 at 6; Doc. 22 at 5.) Thus, the Court must apply the Ninth Circuit's three-pronged test to determine whether Defendants have sufficient contacts with Arizona to be subject to specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Id.* "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

II. Jurisdictional Facts

When ruling a motion to dismiss for lack of personal jurisdiction, "uncontroverted

allegations must be taken as true, and [c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor," but "[a] plaintiff may not simply rest on the bare allegations of [the] complaint." *Ranza*, 793 at 1068 (citations and internal quotation marks omitted).

Here, Blum (Doc. 19-1) and Steward (Doc. 20-1) provided declarations in support of their respective motions to dismiss. In response, Plaintiffs provided declarations from Charles "Chuck" Rahrig, the president and co-founder of E3 Displays, LLC (Docs. 21-1, 22-1) and Adam Hofmann, the vice president of engineering for E3 Displays, LLC (Docs. 21-2, 22-3). And in reply, Blum submitted another declaration. (Doc. 23-1.) Accordingly, the summary of jurisdictional facts below is based on the allegations in the complaint (where uncontroverted), the assertions in Blum's and Steward's declarations (where uncontroverted by Plaintiffs' evidence), and Plaintiffs' evidence.

A. **Blum and DCL**[4]

Blum resides in New York and is a citizen of New York. (Doc. 1-3 ¶ 9; Doc. 19-1 ¶ 3.) DCL is a New York corporation with its corporate headquarters in New York. (Doc. 1-3 ¶ 8; Doc. 19-1 ¶ 4.)

Blum served, in an independent-contractor capacity, as E3's Vice President of Business Development from February 2018 through December 2020. (Doc. 1-3 ¶ 9; Doc. 19-1 ¶ 12.) When serving in this capacity, Blum "worked in New York where E3 opened an office for [him]." (Doc. 19-1 ¶ 13.) Blum's "day-to-day work was all in New York" and he "did not go to Arizona in [his] regular and ordinary course of business." (*Id.* ¶ 16.) "Over the course of [Blum's] nearly two-year period of working as an independent contractor for E3, [he] visited the Phoenix headquarters on only twelve occasions." (*Id.* ¶ 17. *See also* Doc. 21-2 ¶ 4 [Hofmann declaration, providing more detail about the 12 visits].) Some of those visits corresponded with an effort by Blum to "find[] a company in

---

[4] Blum and DCL are named separately, but Plaintiffs often refer to Blum and DCL collectively as "the Blum Defendants" and do not describe a scenario in which DCL would be subject to jurisdiction but not Blum, or vice versa. Thus, the Court treats them as functionally the same entity for purposes of the personal jurisdiction analysis.

Tempe, Arizona to build E3's website and social media presence." (Doc. 21-1 ¶¶ 9-16 [Rahrig declaration].)

Blum's "email through [his] work at E3 was not kept on any equipment or servers in Arizona. All of [his] email was on Microsoft Outlook (cloud based, not server based), and the file repository was on Microsoft Sharepoint and Microsoft Teams and stored 'on the cloud' and not by E3." (Doc. 19-1 ¶ 18.)

From New York, Blum "managed two other New York based independent contractors," and "E3 also sent Adam Hofmann, an engineer, to New York to provide support for the roll out of [Blum's] work with the Business Unit ('BU') 2500, which was [E3's] Asia-based operations (for which [Blum] ran sales)." (*Id.* ¶ 14. *See also* Doc. 1-3 ¶ 17 [complaint, alleging that "Blum's primary responsibility was to generate sales, on E3's behalf, in Business Unit ('BU') 2500, one of E3's business models that includes drop-shipped product primarily produced out of Asia through contract manufacturers, including E3's recently added Asian partner, and delivered to E3's customers."].)[5] One of the E3 customers whom Blum was responsible for servicing was located in Arizona. (Doc. 21-2 ¶¶ 6-8 [Hofmann declaration, describing Blum's interactions with this customer].)

As part of his exit in December 2020, Blum signed the Blum Acknowledgment, which included a "return of property" provision requiring Blum and DCL to "deliver[] to [E3] all property in [their] possession, or under [their] care and control, belonging to [E3]" and "retain[] no copies of any property or information belonging to [E3]." (*Id.* ¶ 19.)

After Blum's exit, E3 discovered that Blum had acted in coordination with DCL and Steward to violate the Blum Acknowledgment and engage in tortious conduct. Specifically, Plaintiffs assert that Blum committed the following intentional acts:

---

[5]  Although the complaint alleges that Blum "managed the Tempe, Arizona Marketing team—KNG Marketing Group—consisting of 7-8 individuals at all relevant times" (Doc. 1-3 ¶ 9), Blum disputes this allegation in his declaration. (Doc. 19-1 ¶ 15 ["I never 'managed' that group as if they were E3 employees. They helped set up the website, and in fact I interacted with them no more than other individuals at E3. I was their New York based interface at E3, and Adam Hofmann was their interface in Arizona."].) Rahrig and Hofmann, in turn, do not dispute Blum's sworn statements on this issue in their declarations.

- "[F]orwarded emails containing E3's confidential business information to DCL and downloaded E3's Forecast Master Excel spreadsheet the day before Blum left E3." (Doc. 21 at 7 [citing Doc. 1-3 ¶¶ 28, 33].)

- "[E]mailed E3 customers and/or leads to tell them that Blum would reach out to them in January 2021, after ending his business relationship with E3." (Doc. 21 at 7 [citing Doc. 1-3 ¶ 28.)

- "[E]mailed E3 employees to request that they cancel ongoing business with customers and/or suppliers, only so Blum and DCL could usurp E3's business opportunities." (Doc. 21 at 7 [citing Doc. 1-3 ¶ 28].)

- "[E]xtracted E3's confidential customer information from E3's customer relationship management (CRM) database to incorporate into the Blum Defendants' CRM and transferred at least six customer leads from E3's CRM to the Blum Defendants' CRM." (Doc. 21 at 7 [citing Doc. 1-3 ¶¶ 29-30].)

- "[U]sed E3 confidential business information to provide a quote on behalf of DCL to an E3 customer that undercut E3's pricing." (Doc. 21 at 7 [citing Doc. 1-3 ¶ 34].)

- "[I]ntentionally cancelled purchase orders from E3 customers and transferred them to the Blum Defendants." (Doc. 21 at 7 [citing Doc. 1-3 ¶ 36.)

B. **Steward**

Steward is a current resident of Virginia and a citizen of Virginia. (Doc. 1-3 ¶ 11; Doc. 20-2 ¶ 6.) However, during his tenure with E3, Steward resided in Minnesota. (Doc. 20-2 ¶ 6.)

As noted, Steward served, in an independent-contractor capacity, as E3's Vice President of APAC Operations from February 2018 through August 2018. (Doc. 1-3 ¶ 11; Doc. 20-2 ¶ 4.) "In this role, [Steward] helped organize and facilitate Asian manufacturers to serve E3's customers, as well as provided technical assistance to E3's customers." (Doc. 20-2 ¶ 8.) "[N]one of those customers are located in the State of Arizona." (*Id.* ¶ 10.)[6]

---

[6] Although the complaint alleges that Steward was "E3's sales lead for E3's Arizona customer" (Doc. 1-3 ¶ 11), the above-cited portion of Steward's declaration contradicts this allegation. Rahrig, in turn, does not mention Steward in his declaration, and thus does not attempt to contradict Steward's contentions on this point. Meanwhile, although the

Steward "worked remotely" for E3 "and performed a majority of [his] work from [his] home in Minnesota." (*Id.* ¶ 11) During his time working for E3, Steward "travelled to the State of Arizona only 8 times." (*Id.* *See also* Doc. 21-2 ¶ 10 [Hofmann declaration, agreeing that Steward made 8 visits].)

As part of his exit in August 2018, Steward signed the Steward Agreement, which contained confidentiality, return of property, non-compete, and non-solicitation provisions. (Doc. 1-3 ¶¶ 21-24.)

After Steward's exit, E3 discovered that Steward had acted in coordination with DCL and Blum to violate the Steward Agreement and engage in tortious conduct. Specifically, Plaintiffs assert that Steward committed the following intentional acts:

- "[M]et with an E3 supplier in Boston on or around September 25, 2018, without E3's knowledge, and held numerous meetings with major Asia-based E3 suppliers in order to confirm that the suppliers would support the Blum Defendants' move away from E3 and not inform E3 of their plans to move." (Doc. 22 at 6 [citing Doc. 1-3 ¶ 46].)

- "[C]onspired to use E3 confidential information and harm E3, as revealed by text message conversations between Blum and Steward, wherein they discussed securing $1 million+ E3 customers, unlawfully soliciting E3 customers, and holding back E3 customer orders until they could move the orders to the Blum Defendants." (Doc. 22 at 6 [citing Doc. 1-3 ¶ 47].)

- "[U]pon information and belief, used E3 confidential information to propose deals with E3 suppliers to move their business to the Blum Defendants." (Doc. 22 at 6 [citing

---

Hofmann declaration contains two paragraphs intended to establish that Steward worked with E3's Arizona customer, both of those paragraphs are preceded with the qualifier "upon information and belief." (Doc. 21-2 ¶¶ 11-12.) The presence of this qualifier means that Hofmann's assertions on this issue are not entitled to any evidentiary weight. *See, e.g.*, *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."); *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) ("Price . . . verified his pleadings based upon 'his own personal knowledge or upon his information and belief.' Although this form of verification avoids the possibility of perjury (or perhaps *because* it avoids the possibility of perjury), it is insufficient for the purposes of opposing a motion for summary judgment."); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Because there is no way to ascertain which portions of Kaufman's affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient . . . .").

Doc. 22-3].)

- "[U]pon information and belief, used E3's resources to process a customer order on behalf of themselves." (Doc. 22 at 6 [citing Doc. 1-3 ¶¶ 44-47].)

### C. E3's Confidential Information

E3 has a team of engineers onsite in Phoenix. (Doc. 21-2 ¶ 14.) Those engineers develop E3's confidential information, "primarily from Phoenix," including "parts, drawings, prototypes, customized equipment to develop parts, and other information." (*Id.*) E3 also "develops pricing schemes and quotes for customers and suppliers" in Phoenix, "as well as from remote locations." (*Id.* ¶ 15.)

"E3 has several file storage locations for its pricing schemes and quotes on a local drive E3 refers to as 'common' and which is located in Phoenix, as well as multiple cloud-based SharePoint sites." (*Id.*) "Although individuals may access the cloud-based SharePoint sites from anywhere . . . individuals must have permission and access rights in order to access E3's cloud-based information. Those rights originate out of Phoenix, where E3's Information Technology contractor . . . manages and grants rights to E3 employees and contractors at the direction of E3 leadership in Phoenix . . . ." (*Id.*)

"Epicor—E3's enterprise resource planning software—is cloud-based and holds E3's operational and financial information, as well as all supply orders and purchase orders with E3's suppliers' and customers' financial information." (*Id.* ¶ 16.) "Most contributors to the information stored in Epicor are located in Phoenix. Again, individuals must have access rights to access Epicor, which originate from Phoenix." (*Id.* ¶ 16.)

"E3's supply chain for both its customers and suppliers is funneled through Phoenix, Arizona. All E3 suppliers are maintained on E3's Approved Vendor List, a list which is maintained through Epicor. E3's customer information is also maintained through Epicor." (*Id.* ¶ 17.)

…

…

…

III. Analysis

    A. **Plaintiffs' Narrow Theory Of Specific Personal Jurisdiction**

As noted, the first prong of the test for specific personal jurisdiction involves an assessment of whether each defendant purposefully directed his activities toward the forum state or purposefully availed himself of the privilege of conducting activities there. *Morrill*, 873 F.3d at 1142. Courts "generally apply the purposeful availment test when the underlying claims arise from a contract, and the purposeful direction test when they arise from alleged tortious conduct." *Id.*

Here, the complaint asserts eight claims: (1) breach of contract (return of property), (2) breach of contract (confidential information), (3) breach of contract (return of property and confidential information), (4) breach of contract (non-solicitation of customers and suppliers and non-interference with business relationships), (5) misappropriation of confidential information, (6) tortious interference with contractual or business relations, (7) unfair competition, and (8) civil conspiracy. (Doc. 1-3 ¶¶ 53-109.) Counts 1-4 sound in contract while Counts 5-8 sound in tort. However, Plaintiffs do not ask the Court to apply the purposeful-availment test or otherwise suggest that their breach-of-contract claims give rise to personal jurisdiction. (*See* Doc. 21 at 6 [applying the purposeful-direction test and explaining that the Court may exercise pendent jurisdiction over contract claims if it finds personal jurisdiction as to a tort claim]. *See also* Doc. 23 at 2 ["Plaintiffs' Opposition abandons the 'purposeful availment' analysis and instead relies exclusively upon pendant personal jurisdiction to advance their contract-based claims."]; Doc. 24 at 3 [same].) Additionally, Plaintiffs assert that each of their tort claims depend on "unlawful use, disclosure, and misappropriation of E3's confidential business information" and that "the claims arise out of the same common nucleus of operative facts as the misappropriation of confidential information." (Doc. 21 at 6; Doc. 22 at 5.) Thus, and as requested by Plaintiffs, the Court will "focus[] on the misappropriation of confidential information tort claim" (*id.*) when analyzing whether Defendants are subject to specific personal jurisdiction in Arizona.

B. **Purposeful Direction—Misappropriation Of Confidential Information**

Purposeful direction requires the defendant to have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Morrill*, 873 F.3d at 1142 (internal quotation marks omitted). "'[R]andom, fortuitous, or attenuated contacts' are insufficient to create the requisite connection with the forum." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

i. Intentional Act

As for the first component of the purposeful-direction test, "[t]he meaning of the term 'intentional act' in our jurisdictional analysis is essentially the same as in the context of intentional torts; namely, the defendant must act with the 'intent to perform an actual, physical act in the real world.'" *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015).

Here, Plaintiffs allege and proffer evidence that Defendants committed intentional acts. According to the complaint, Defendants committed intentional acts when they took confidential information (*e.g.*, forwarding E3 emails to DCL, extracting customer information from databases) and when they used that information for their benefit and to E3's detriment (*e.g.*, soliciting E3 customers, "undercutting" E3 pricing). Thus, Plaintiffs have sufficiently alleged that Defendants acted intentionally, meeting the first element of the purposeful-direction test.

ii. Express Aiming

The second component of the purposeful-direction test, "express aiming," looks to whether the allegedly tortious conduct was "expressly aimed" at the forum. *Id.* This inquiry is fact-specific, but the Court is guided by the principle that it "must focus on the defendant's contacts with the forum state, not the defendant's contacts with a resident of the forum." *Id.* Notably, "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

…

…

a. **Parties' Arguments—Blum Defendants**

The Blum Defendants argue that, although the complaint alleges intentional acts, "all were performed in New York" and the complaint "does not set forth any allegations that any of the alleged acts were expressly aimed at Arizona." (Doc. 19 at 11.) The Blum Defendants further contend that "a defendant's connection to the forum state through the plaintiff alone is insufficient [to] allege the expressly aimed conduct required to confer specific jurisdiction. At bar, the only connection with Arizona is E3's headquarters. If E3 was based in any other state, this would not change the location of the wrongful acts alleged in the Complaint." (*Id.* at 12.)

Plaintiffs respond that "the Blum Defendants expressly aimed their intentional acts at Arizona. Blum accessed E3's confidential information, which was developed in Arizona by E3's Arizona personnel, which was used to fulfill customer orders through E3's Arizona channels, and access to which originated from Phoenix. Blum and DCL used their contractor relationship with E3, an Arizona business, and a relationship which was negotiated as part of a deal in Arizona, to access E3's confidential information. E3's confidential information arose out of Arizona. The Blum Defendants then used that confidential information to compete directly with E3, an Arizona business. Moreover, while at a dinner meeting in Phoenix, Blum misrepresented to Mr. Rahrig that he was acting in E3's best interests when, in fact, he had already been working with Steward to damage E3." (Doc. 21 at 7-8.) Plaintiffs identify *DBSI, Inc. v. Oates*, 2020 WL 5517305 (D. Ariz. 2020), as a case supporting the exercise of personal jurisdiction in Arizona under these circumstances. (*Id.*)

In reply, the Blum Defendants accuse Plaintiffs of improperly focusing on "Defendants' remote connections to the forum state through the Plaintiff alone, which is insufficient to substantiate jurisdiction." (Doc. 23 at 4.) They also state that Plaintiffs are erroneously inviting the Court to analyze "strong forum connections" and "foreseeable harm," which are components of a defunct personal jurisdiction analysis rejected by Supreme Court and the Ninth Circuit as recently as 2020. (*Id.* at 4-5.) As for *Oates*, the

Blum Defendants argue it is distinguishable for a variety of reasons, including that the plaintiff-company's servers in that case were located in Arizona. (*Id.* at 5.) In contrast, they assert that any "information that [Blum/DCL] could have allegedly misappropriated was not located on any servers in Arizona, but on a Sharepoint cloud system. . . . [Further,] Defendants are alleged to have accessed the cloud, and not Arizona servers, from New York in allegedly committing their tortious acts." (*Id.* at 5-6.) In support of their claim that personal jurisdiction will not lie "where the servers are located outside the state, and thus where the tortious act is alleged committed outside the state," the Blum Defendants cite *Dahn World Co. v. Chung*, 2006 WL 1794758 (D. Ariz. 2006). Finally, the Blum Defendants assert that the "final reference to a January 2020 meeting . . . has absolutely nothing to do with the misappropriation tort claim on which Plaintiffs are attempting . . . to hand the jurisdiction of their whole case." (*Id.* at 4 n.3.)

b. **Analysis—Blum Defendants**

Plaintiffs appear to be raising four theories of "express aiming" with respect to the Blum Defendants: (1) Blum's accessing of E3's confidential information constituted express aiming because the information was developed in Arizona, was "used to fulfill customer orders through E3's Arizona channels," and Blum received access to the information via permissions granted by E3's Arizona office; (2) Blum's exploitation of his position with E3 to get access to that information constituted express aiming because E3 is an Arizona business and his employment was negotiated in Arizona; (3) Blum's use of the information to compete with E3 constituted express aiming because E3 is an Arizona business; and (4) Blum's lying to Rahrig while at a 2020 dinner meeting[7] in Phoenix constituted express aiming because it occurred in Arizona.

Taking the final theory first, Plaintiffs do not assert that Blum's dinner meeting with Rahrig was related to, or in any way furthered, the tort of misappropriation of confidential

---

[7] Rahrig's declaration refers to a number of business dinners with Blum, but this particular dinner was held on January 8, 2020 at P.F. Chang's in North Phoenix. (Doc. 21-1 ¶ 8.) At that dinner, Blum proposed that he would take on a larger role at E3 by, among other means, eventually taking on a 25% stake in the company. (*Id.*)

information. Thus it is not relevant to the "express aiming" analysis.

The remaining theories all suffer from the defect of focusing on Blum's contacts with a resident of the forum—*i.e.*, Plaintiffs—and the harm Plaintiffs experienced in the forum, rather than on Blum's contacts with the forum. The Supreme Court rejected this approach in *Walden v. Fiore*, 571 U.S. 277 (2014). Walden was a deputized DEA agent who seized $97,000 in cash from Fiore and others at the Atlanta airport. *Id.* at 279-80. Walden detained the cash while Fiore continued her flight to Nevada, where she maintained a residence. *Id.* At some later point, Walden drafted an affidavit to show cause for forfeiture of the funds, but that affidavit was shown to be false and misleading. *Id.* at 280-81. The DEA ultimately returned the funds to Fiore, and Fiore then filed a *Bivens* suit against Walden in Nevada. The Ninth Circuit held that Walden was subject to personal jurisdiction in Nevada because he had submitted the affidavit with knowledge it would affect persons with a "significant connection" to Nevada, but the Supreme Court reversed, holding that "when viewed through the proper lens—whether the defendant's actions connect him to the forum—petitioner formed no jurisdictionally relevant contacts with Nevada. The Court of Appeals reached a contrary conclusion by shifting the analytical focus from petitioner's contacts with the forum to his contacts with respondents." *Id.* at 289. The Court emphasized that "[t]his approach to the minimum contacts analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis. Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections. Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis. It also obscures the reality that none of petitioner's challenged conduct had anything to do with Nevada itself." *Id.* (citations and quotation marks omitted).

As in *Walden*, none of Blum's challenged conduct (*i.e.*, misappropriation of confidential information) has anything to do with Arizona itself. The misappropriation may have harmed an Arizona resident, but it would be error to impute E3's forum

connections to Blum. That E3 is an Arizona business does not, on its own, establish that Blum expressly aimed his alleged conduct at Arizona because it does not relate to *Blum's* conduct. In the same vein, it is irrelevant for "express aiming" purposes that Blum's contractor relationship was negotiated in Arizona, that the confidential information was developed in Arizona and used to fulfill customer orders through Arizona channels, or that Blum received access to the information via permissions granted by E3's Arizona office. This is because those facts are inextricably bound up with E3's location in Arizona. If, for example, E3 had been headquartered in California, none of those asserted contacts would have occurred in Arizona: the contractor relationship would have been negotiated in California, the confidential information would have been developed in California, and so on. None of these considerations suggest that Blum expressly aimed his misappropriation tort at Arizona, as opposed to whatever state happened to surround E3's headquarters. *See also Picot*, 780 F.3d at 1215 ("Picot's injury . . . is not tethered to California in any meaningful way. Rather, his injury is entirely personal to him and would follow him wherever he might choose to live or travel."); *Gonzalez v. US Hum. Rts. Network*, 512 F. Supp. 3d 944, 956 (D. Ariz. 2021) ("Any links to Arizona . . . occurred only because it happened to be where Plaintiffs resided."); *Modulus Fin. Eng'g, Inc. v. Modulus Data USA, Inc.*, 2020 WL 2512785, *5 (D. Ariz. 2020) ("[Plaintiff's] request improperly asks the Court to [only focus on where *Plaintiff* was harmed] by considering its location in Arizona and importing its forum connections to Defendants. Again, courts have repeatedly rejected this argument.").[8]

Nor does *Oates* support a finding of personal jurisdiction in this circumstance. Although that case also involved allegations that an out-of-state defendant had misappropriated confidential information from the Arizona-based company for whom he

---

[8] Additionally, although Plaintiffs frequently mention Blum's work with E3's "Arizona client" while he was associated with E3, Plaintiffs do not allege that Blum misappropriated information relating to the Arizona client or sought to undercut E3's relationship with that particular client. Blum states that it is "unrefuted by E3" that "no Arizona customers are at issue in the lawsuit" (Doc. 23-1 ¶ 22) and Steward concurs (Doc. 20-2 ¶ 10).

worked, the company in that case submitted evidence that the misappropriation occurred when the defendant "remotely accessed [its] servers located in Arizona." 2020 WL 5517305 at *1.[9] Here, in contrast, Blum's declaration establishes (Doc. 19-1 ¶ 18), and Hofmann's declaration does not refute (Doc. 21-2 ¶¶ 15-20), that the alleged acts of misappropriation involved email accounts and cloud-based servers *not* located in Arizona.[10] This distinction is important because "[t]he 'express aiming' analysis depends, to a significant degree, on the specific type of tort at issue." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 807 (9th Cir. 2004). As many courts have recognized, when "plaintiffs allege that defendants targeted and accessed [their] servers without authorization," "[t]he location of the server is . . . not a fortuity but central to the alleged tortious conduct." *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 672 (N.D. Cal. 2020). *See also Dahn World Co. Ltd. v. Chung*, 2006 WL 1794758, *3 (D. Ariz. 2006) ("[T]he servers, on which the confidential information is housed, are located in Korea. Therefore, Defendants' alleged taking of information does not create a connection between Defendant and the forum state.").[11]

---

[9] *Accord Seattle Sperm Bank, LLC v. Cryobank Am., LLC*, 2018 WL 3769803 (W.D. Wash. 2018) (non-resident defendants subject to personal jurisdiction in Washington, in case alleging they had misappropriated trade secrets from their Washington-based employer while working remotely, where the evidence showed that the misappropriation occurred "from a server located in Washington").

[10] *Oates* is also distinguishable for other reasons. There, the defendant signed a contract with an Arizona choice-of-law clause and misappropriated information relating to Arizona clients. Here, Plaintiffs do not argue that the Blum Acknowledgment gives rise to jurisdiction and, as discussed elsewhere, have not established that Blum misappropriated information relating to Arizona clients. Finally, although Plaintiffs appear to believe that the number of occasions on which Defendants visited Arizona (for reasons unrelated to the alleged acts of misappropriation) supports their position, *Oates* suggests otherwise. 2020 WL 5517305 at *3 (noting that defendant's "fifty-two business trips to the state . . . are not suit-related conduct that would directly give the Court specific jurisdiction").

[11] Even if the location of a server may be "central to" a personal jurisdiction analysis, a server's location in the forum state does not automatically establish jurisdiction. *See, e.g., Man-D-Tec, Inc. v. Nylube Prods. Co.*, LLC, 2012 WL 1831521, *2 (D. Ariz. 2012) ("If the mere location of a server could create personal jurisdiction, any state where a server is located would have personal jurisdiction over any user of that server.") For example, some courts have resolved the Ninth Circuit's demand for an intentional act by requiring that a defendant be *aware* he was accessing a server in the forum state. *See, e.g., Climax Portble Mach. Tools, Inc. v. Trawema GmbH*, 2020 WL 1304487, *5 (D. Or. 2020) ("Other courts also have found that acquisition of trade secrets from a server in the forum state with knowledge of its location, or other intentional and knowing improper use of a computer server in the forum state, creates enough minimum contacts to support personal

Although Plaintiffs need only make a prima facie showing of jurisdictional facts, this requirement "is not toothless." *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019). As discussed above, Plaintiffs have not met their burden of establishing the "express aiming" prong of the purposeful-direction test as it relates to their misappropriation of confidential information tort claim against Blum and DCL. And because Plaintiffs have not developed any theory as to why one of their other claims might support the exercise of personal jurisdiction over Blum and DCL in Arizona, it follows that Blum and DCL are entitled to dismissal. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013) ("If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law.") (citation omitted)).

### c. **Analysis—Steward**

That leaves Steward. Plaintiffs' "express aiming" arguments related to Steward are nearly identical to their arguments related to Blum and DCL (although Plaintiffs obviously do not mention Blum's dinner with Rahrig). (Doc. 22 at 6-7.)[12] Accordingly, Steward is not subject to personal jurisdiction in Arizona, either.

IV. Motion To Transfer Venue

Because the Court grants both motions to dismiss, the alternative requests to transfer venue are denied as moot.

…

---

jurisdiction, without analyzing the effects test.") And there are still more complications when a third party hosts or owns the server rather than the plaintiff, which may be the case here. *See, e.g.*, *Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160, *5 (N.D. Cal. 2020) ("Plaintiff's central argument for jurisdiction is that Defendants accessed servers owned by third parties that happen to be based in or have servers in California. But district courts in this circuit have held that the mere location of a third party or its servers is insufficient to give rise to personal jurisdiction."). It is unnecessary to wade into those complexities here because Plaintiffs do not assert that Defendants misappropriated information from servers located in Arizona.

[12] Plaintiffs also make certain arguments related to Steward that do not come close to establishing "express aiming" toward Arizona for purposes of a misappropriation of confidential information claim, such as the arguments that Steward "met with an E3 supplier in Boston on or around September 25, 2018" and "held numerous meetings with major Asia-based E3 suppliers." (Doc. 22 at 6.)

Accordingly,

**IT IS ORDERED** that both motions to dismiss for lack of personal jurisdiction (Docs. 19, 20) are **granted**. The Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 2nd day of December, 2021.

_____
Dominic W. Lanza
United States District Judge